OPINION OF THE COURT
Thomas J. Lowery, J.
These negligence claims arose out of a one-car accident that occurred shortly after midnight on August 8, 1980, when a vehicle in which Jana Rhubart, Ellen Skiff and Linda Nellenback were passengers left State Route 12 and traveled along a drainage ditch into an earthen headwall.
There were no witnesses to the accident other than the occupants of the vehicle. As to them, Linda Nellenback and Kim Fenton, the driver of the vehicle, were fatally injured. One of the occupants, Rhoda Van Nest, was not called as a *792 witness.[1] The remaining two, Jana Rhubart and Ellen Skiff, testified that they had no specific recollection of the event. Consequently, no direct proof was offered as to the manner in which the accident occurred.
The postaccident investigation established that the vehicle in which the young women were riding had been proceeding north on State Route 12 toward Lowville. As their vehicle entered a left-hand curve[2] just south of the intersection of State Route 12 with Burke Road, it proceeded straight, off the traveled way, into the shoulder. Thereafter, its right tires became ensnared in a drainage ditch that flanked the shoulder area while its left tires remained on the shoulder. The vehicle traveled in this position for some 200 feet. At that point, its left tires also entered the ditch and it struck an earthen headwall at the intersection of Burke Road. Upon striking the headwall, the vehicle was catapulted through the air a distance of 97 feet, landing in a field on the opposite side of Burke Road. It then rolled over several times, traveling an additional 10 feet before finally coming to rest. There was no evidence of any skid marks that would tend to indicate that Kim Fenton applied her brakes either before or after leaving the highway.
State Route 12, which had been designed and constructed in 1932, was a two-lane undivided rural highway. When designed, the plans called for 10-foot lanes of crowned pavement, with seven feet of unimproved shoulder on either side. A drainage ditch was to be constructed along the east side of the highway with an 18-inch cast iron pipe running under Burke Road. The typical sections provided that in all cases, the slope of an enbankment adjacent to the road was to be no less than one on four.[3] There was no evidence that at the time of its construction, the highway did not conform to the plans.
Additional work was done on the highway in 1973 and 1975. On both occasions, the work was classified as a resurfacing and rehabilitation project. According to the *793 State’s Highway Design Manual, the key to such projects was to apply the prevailing State design criteria with some flexibility, adjusting them to actual field conditions and using them merely as guidelines rather than fixed standards. In addition, the manual provided that although the focus of such projects was primarily on resurfacing, known safety hazards would be corrected. It is significant that elsewhere in the manual, drainage ditches utilizing nontraversable slopes (less than one on four) are recognized as roadside hazards. In addition, the manual recognizes that culvert head walls are fixed objects that are likely to be involved in off-the-road accidents.
The work performed in 1973 consisted of resurfacing the highway in the area of the accident. In the course of the same, the curve was to be superelevated so that the highest point of the pavement was at its easterly edge. Shoulders were to be improved and paved to the extent of four feet. Fill was to be placed along the remaining three feet of shoulder, so as to bring it to grade, and it was to be seeded. No work was to be done in the drainage ditch, despite the fact that it would no longer be required to drain the highway. The 1975 contract provided, inter alia, for signing and guide rail work in the area of the 1973 contract and for resurfacing along another stretch of State Route 12. No guide rails were called for in the area of the drainage ditch. Other than general maintenance, no additional work was done thereafter on the highway in the area of the accident.
There was no artificial illumination where the accident occurred. Photographic evidence demonstrated that the highway surface in the area of the curve was marked with a solid double yellow line and white edge lines. The curve was banked to the left in accordance with the 1973 plans. A standard curve sign was posted in advance of the curve. Although the prevailing speed limit was 55 miles per hour, a 50-mile-per-hour recommended speed sign was also posted. Two delineators were installed along the curve a short distance beyond the edge of the shoulder, one at the intersection of Burke Road, and the other approximately 260 feet to the south. A standard turn sign was posted on Burke Road, just east of the intersection, but was visible to northbound motorists on State Route 12. The four feet of *794 improved shoulder area was broken and crumbly, particularly near the point where the vehicle left the traveled way. Immediately adjacent thereto was two to three feet of unimproved shoulder area. This was somewhat lower than the grade of the improved shoulder and appeared to be worn.
The drainage ditch began at the break of the unimproved shoulder. Photographs reveal that the ditch was not readily discernible, since it was overgrown with grass and weeds. Field measurements made following the accident indicate that the ditch was two feet wide at the bottom and 12 feet wide at the top. It varied in depth from 2.4 feet to 3.9 feet and had an average slope on its road side of 1 on 1.83. The slope on its back side was estimated at 1 on 1.5. Its physical characteristics were such that it could not be traversed[4] by a motor vehicle. The 18-inch pipe extending from the earthen headwall was situated approximately three feet from the eastern edge of the unimproved shoulder and its top was approximately two feet below the grade of Burke Road.
It is well settled that the State is not an insurer of the safety of persons using its highways. (Boyce Motor Lines v State of New York, 280 App Div 693, affd 306 NY 801.) It is only charged with the duty of maintaining them in a reasonably safe condition and liability will flow from a breach of that duty. (Highway Law, § 12; Lopes v Rostad, 45 NY2d 617.) The duty is fulfilled so long as a highway may be said to be reasonably safe, taking into consideration such factors as the traffic conditions apprehended, the terrain encountered, fiscal practicality and a host of other criteria. (Annino v City of Utica, 276 NY 192.)
Where a condition exists that may be hazardous to motorists, and of which the State has either actual or constructive notice, the State is obligated to correct the condition or warn motorists of its presence. (Sanchez v Lippincott, 89 AD2d 372.) The duty extends not only to the road surface and shoulders (Bottalico v State of New York, 59 NY2d 302), but also to conditions adjacent to (Trabisco v City of New York, 280 NY 776) and above the highway *795 (Rinaldi v State of New York, 49 AD2d 361; Edgett v State of New York, 7 AD2d 570) that would reasonably be expected to result in injuries and damages to highway users. The scope of the duty or the standard of care to which the State will be held is that of a landowner, namely, “reasonable care under the circumstances whereby foreseeability shall be a measure of liability.” (Basso v Miller, 40 NY2d 233, 241; see, also, Scurti v City of New York, 40 NY2d 433; Sanchez v Lippincott, 89 AD2d 372, supra; Muallem v City of New York, 82 AD2d 420.)
In the present case, the claimants concede that no negligence can be ascribed to the State for Kim Fenton’s vehicle departing the traveled way. They contend, however, that the drainage ditch and earthen headwall posed a danger to motorists that should either have been removed or guarded against. It is alleged that the State’s negligence in failing to do so was a substantial factor in aggravating the injuries that were sustained in the accident. (See Gutelle v City of New York, 55 NY2d 794; Stuart-Bullock v State of New York, 33 NY2d 418.)
Relying on Tomassi v Town of Union (46 NY2d 91), the State urges that it owed no duty to improve and maintain the land abutting the highway in a reasonably safe condition for passage by automobiles, given that the road itself was adequately constructed. The State further asserts that its decision in 1975 not to place a guide rail in the area of the accident was made after adequate study and, hence, was immune from review. (See Weiss v Fote, 7 NY2d 579.) Finally, the State submits that the sole proximate cause of the accident was the negligence of Kim Fenton.
In order to succeed, the claimants must demonstrate that the injuries for which damages are sought were sustained wholly or in part by a cause for which the State was responsible. (Stuart-Bullock v State of New York, 38 AD2d 626, affd 33 NY2d 418, supra; Frohm v State of New York, 34 AD2d 724, affd 28 NY2d 703.) As to the claim of Linda Nellenback, the less stringent evidentiary standards for wrongful death cases will apply. (Noseworthy v City of New York, 298 NY 76.) With respect to the claims of Jana Rhubart and Ellen Skiff, no medical evidence was submitted that would tend to establish a causal connection be *796 tween their amnesia and the injuries they received in the accident so as to entitle them to a lesser burden of proof. (Schechter v Klanfer, 28 NY2d 228; but see, also, Hager v Mooney Aircraft, 63 AD2d 510, 524-525.)
Turning to the issue of the State’s liability, inasmuch as it has been conceded that no negligence by the Sate caused the Fenton vehicle to leave the traveled way, our inquiry must focus on the State’s negligence, if any, thereafter. In this regard, there is ample proof that the ditch, which was created by the State and of which it is presumed to have notice, was inherently dangerous and constituted a trap or snare.[5] Its nontraversable nature was recognized not only by the State’s own current standards, but also the standards that prevailed at the time of its construction in 1932. Hence, at the very least, it was not maintained in accordance with the original design plans. Moreover, its location on a curve in close proximity to the shoulder, in combination with such other factors as the crumbly and distressed condition of the improved shoulder, the apparent use of the unimproved shoulder area by other vehicles, the grass and weeds in the ditch that concealed its presence, the turn sign on Burke Road, and the spacing of the two delineators, made it reasonably foreseeable that vehicles seeking refuge on the shoulder would come in contact with the ditch and be tracked into the earthen headwall. Under the circumstances, the inescapable conclusion is that in the vicinity of the accident, the State breached its duty to maintain the highway shoulders and the area immediately adjacent thereto in a reasonably safe condition. Reasonable care, as well as fiscal practicality, dictated that the ditch and headwall be removed, particularly since the structures no longer served a useful purpose.
The State’s reliance on Tomassi v Town of Union (46 NY2d 91, supra) is misplaced. In that case, the drainage ditch served a valuable function and did not constitute a trap or snare. Moreover, it was found that the accident was caused solely by driver error and not by any negligence on *797 the part of the municipality. In contrast, it must be held here that the condition of the improved and unimproved shoulders as well as the ditch was a substantial factor in bringing about the accident and the resulting injuries.[6] (See Koester v State of New York, 90 AD2d 357, app withdrawn 58 NY2d 972.) Tomassi (supra) stands only for the proposition that the standard of care required of the municipality did not, under the circumstances there presented, rise to the level of imposing a duty to eliminate the remote danger inherent in the ditch.
Likewise, any reliance by the State on Weiss v Fote (7 NY2d 579, supra) to relieve it of liability is unavailing. In the instant case, liability is predicated on the State’s failure to properly maintain the shoulder and eliminate the structures appurtenant thereto and not its decision in 1975 that no guide rails were called for along this stretch of highway.
In sum, the court finds that the State was negligent and that such negligence was a substantial factor in bringing about the happening of the accident and the resultant injuries, for which the State must respond in damages. There was no evidence that Jana Rhubart, Ellen Skiff or Linda Nellenback, all of whom were passengers, were guilty of any culpable conduct that may have contributed to the happening of the accident. (See CPLR 1411, 1412.)
[Damage portion of decision deleted for purposes of publication.]

. No inference unfavorable to either side may be drawn from the failure to call this witness, since it does not appear that she was under the control of any of the parties to this action. (See Leear v McGrath Corp., 52 AD2d 804.)

. Four degrees, 1,450-radius.

. For every four feet of horizontal distance, there would be a one-foot vertical drop.

. Websters New Collegiate Dictionary defines traverse as “to ascend, descend, or cross (a slope or gap) at an angle” (emphasis added). See, also, S.M., p 190.

. Evidence was submitted of a prior accident at the same location, allegedly occurring under substantially similar circumstances. Such evidence tends to support a finding that the ditch and headwall constituted a dangerous condition. (See Gastel v City of New York, 194 NY 15.)

. In view of this finding, the claimants’ theory that the injuries sustained were merely aggravated by the State’s negligence has no application.